# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

NARCISO JOSE ALEJANDRO )
CASTELLANOS, on behalf of )
himself )
and others similarly situated, )   Case No. 2:14-cv-12609
    Plaintiff, )
       v. )
     )   Hon. Stephen J. Murphy, III
WORLD WIDE DISTRIBUTION )
SYSTEMS USA, LLC d/b/a )
SYSTEMS USA, RAJAT MOHAN, )
JESSICA RODRIGUEZ )
    Defendants, )

# PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANTS'
# MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ii

Plaintiff's Counter Statement Of Disputed Facts And Additional Facts . . .   1

    I.    Defendants, acting wholly within the United State caused a domestic injury to class members' property namely their jobs, income and money. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8

Class members had a contractual and statutory right to be paid the salary promised to them in the offer letters and TN letters sent which were not a mere "expectancy." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

        i.    The loss of promised income is not an intangible harm, it is a loss of property. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

        ii.    Not paying an employee a promised salary is not the mere loss of an "expectancy", it is a loss of property. . . . . . . . . . . . . . . . .   15

        iii.    RICO does not require victims to have relied upon a fraudulent statement for liability to attach. . . . . . . . . . . . . . . . . . . . . . . . . .   17

        iv.    Class members' harm were caused by Defendants' conduct. .   18

II.    Plaintiff has adequately pled the SUSA was an enterprise which Defendants conducted through a pattern of racketeering activity. .   19

III.    The intra-corporate conspiracy doctrine cannot be used to defeat RICO claims in light of the case law finding employees, owners and corporations to be distinct legal entities. . . . . . . . . . . . . . . . . . . . . . . .   22

IV.    Defendants argument with respect to the fraud claim fails as it requires the Court to decide disputed facts to resolve. . . . . . . . . . . . .   23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   25

## TABLE OF AUTHORITIES

*Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639 (2008) . . . . . . . . . . . 17

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001) . . .19, 20 , 21

*Heinold v. Perlstein*, 651 F. Supp.1410 (E.D. Pa. 1987) . . . . . . . . . . . . . . . 16

*McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215 (2d Cir. 2008) . . . . . . . . . . 15

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016) . . . . . 11

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S.*

*LLP*, 806 F.3d 71 (2d Cir, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Strates Shows, Inc. v. Amusements of Am., Inc.*, 379 F. Supp. 2d 817

(E.D.N.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*United States v. Del Valle*, 674 F.3d 696 (7th Cir. 2012) . . . . . . . . . . . . . 9, 16

*United States v. Sorich,* 523 F.3d 702 (7th Cir. 2008) . . . . . . . . . . . . . . . 9, 16

## PLAINTIFF'S COUNTER STATEMENT OF
## DISPUTED FACTS AND ADDITIONAL FACTS

1.    Plaintiff disputes the contention at Docket 57 ¶ 2 that Rajat Mohan was acting within the "scope of his employment."  The exhibit cited by Defendants (Docket 57-1 ¶ ¶ 2, 8), states that Mohan is an officer and member of SUSA but not an employee and therefore could not be acting within the scope of his "employment".

2.     Plaintiff disputes the contention at Docket 57 ¶ 3 that Jessica Rodriguez was acting within the "scope of her employment."  Committing fraud, and recruiting workers with no intent to pay for their time until they are placed with a third party (Docket 60-1 Corrected exhibit Jessica Rodriguez Deposition pp. 44-45). while obligating them to show up for work daily (Docket 60-1p.45)  cannot be within the scope of an employee's work.

3.    Plaintiff disputes the contention at Docket 57 ¶ 8, that Rodriguez told Castellanos that "SUSA would provide support 'once Castellanos is confirmed for a project'" because it is vague. Plaintiff disputes this assertion to the extent it implies that Plaintiff would not be paid the salary promised in its offer letter and TN visa letter until SUSA found a placement for him – which Defendants do not assert here.

Plaintiff also objects to and disputes the statement "Castellanos stated that he

understood, and that "there was no problem for [him] to work by projects", to the extent it implies that Castellanos was aware that this meant he might wait months to get paid by SUSA and acquiesced to this. When Mr. Castellanos asked of Jessica Rodriguez in a Skype conversation, whether he should report to SUSA's offices in Michigan, or to an assignment somewhere else, Jessica Rodriguez replied that he would come to Michigan first, and that he would answer calls from prospective clients until he was able to get a Social Security card and open a bank account. (Docket 59-4 pp. 8-10; Docket 59-6 pp. 5-6 (Bates 103-104)). Furthermore, Castellanos testified at deposition that Shortly after arriving in the United States, Plaintiff learned from other class members that Defendants did not, in fact, have a job available for him, would not employ him until they found a third party employer who would approve his hire, and would not pay him a salary until then. (Docket 59-4 pp.12-13)

4.     Plaintiff disputes the contention at Docket 57 ¶ 9, to the extent implied that Castellanos understood and/or agreed to not be paid his promised salary even if the placements were "not continuous."  Castellanos was never told this directly. (Docket 59-4 pp. 8-10; Docket 59-6 pp. 5-6 (Bates 103-104)). (Docket 59-4 pp.12-13)

5.     Plaintiff disputes the contention at Docket 57 ¶ 10, to the extent implied that Castellanos understood and/or agreed to not be paid his promised salary for

months. Castellanos was never told this directly and setting up a bank account and obtaining a social security card does not take months. (Docket 59-4 pp. 8-10, 12-13; Docket 59-6 pp. 5-6 (Bates 103-104)).  Additionally, workers need not have a Social Security Card in hand to be employable, the Social Security Administration (SSA) has offered guidance stating that employees can work once they have applied for a card and show proof to the employer: https://www.ssa.gov/pubs/EN-05-10107.pdf  Finally, Plaintiff disputes any implication that knowing that he needed to be interviewed by a client meant that he knew, understood, or agreed that  would not get paid while he was daily going to SUSA's offices. (Docket 59-4 pp. 8-10, 12-13; Docket 59-6 pp. 5-6 (Bates 103-104); Docket 57-10 )

6.      Plaintiff objects that Defendants' contention at Docket 57 ¶ 12 is irrelevant. Despite what Defendants told class members, the fact that SUSA drafted and sent TN visa letters to recruits to submit to the United States Embassy, means that class members suffered harm from these statements that were not directed at them, but constituted visa fraud and fraud in foreign labor contracting and were essential to depriving them of their right to pay. Further, Plaintiff disputes the contention at Docket 57 ¶ 12 that he was told by Defendants that he would not get paid until he was placed with a client. (Docket 59-4 pp. 8-10, 12-13; Docket 59-6 pp. 5-6 (Bates 103-104); Docket 57-10 stating "[t]his offer of employment at will is contingent upon the following: Your execution of this letter/attached employment agreement;

Approval of TN Visa; [and] proof of employment eligibility.”))

7.     Plaintiff notes that in the exhibit cited in support of  Docket 57 ¶ 13,
Rodriguez states: “Also I am sending you a format for your resume, all progress
developers we have modify their resumes, sometimes we need to add a project you
worked here in the US ( if you don't have one), because that attracts clients.”
Rodriguez disclaimed any knowledge of asking people to falsify their resumes at
deposition. (Docket 60-1 pp. 11-13)

8.     Plaintiff disputes the contention at Docket 57 ¶ 14 to the extent it implies
that it did not have to pay Castellanos until approved or hired by a third party and
that not being paid is somehow his fault. (Docket 59-4 pp. 8-10, 12-13; Docket 59-
6 pp. 5-6 (Bates 103-104); Docket 57-10)

9.     Plaintiff notes that the employment contract that Defendants sent to
Castellanos and used to support Defendant's contention at Docket 57 ¶ 15, says
nothing about needing to be placed with a client, nor approved by said client to
begin getting paid. Nor do the TN visa letters say anything about this either.
(Docket 59-2 pp. 1-2 (Castellanos' TN letter) and 59-2 generally for other class
members).

10.     Plaintiff disputes the contention at Docket 57 ¶ 17, that suggests or implies
that the TN visa letter apprised Castellanos or the United States Embassy that
SUSA had no intention of paying its recruits until they were actually working for a

third party. The letter also states: "Mr. Castellanos *will be* working with Systems USA as a Computer Systems Analyst from 3/28/2013", and "*we require* Mr. Castellanos [sic] services temporarily for three years starting 3/28/2013 and ending no later than 3/27/2016." (Docket 59-1 p. 15, also Docket 57-10) Plaintiff further disputes any implication that the word "temporarily" conveys to anyone that Mr. Castellanos would not be paid while he showed up daily for work – for months.

11.     Plaintiff disputes the contention at Docket 57 ¶ 12 to the extent it implies that the conversation suggested that it would take months to be paid. Also notably, Rodriguez says nothing about not being paid a salary when Castellanos arrives. Castellanos understood this to mean that there would be short wait to get a Social Security card and bank account before he was placed in a project. (Docket 59-4 pp. 9-10, 12; Docket 59-6 pp. 5-6 (Bates 103-104) )

12.      Plaintiff disputes the contention at Docket 57 ¶ 24 ("despite his earlier communications with Ms. Rodriguez…") that implies that Rodriguez told Castellanos he would not get paid until he was placed in a project. (Docket 59-4 pp. 9-10, 12; Docket 59-1 p.15; Docket 57-10) Notably, Defendants have not pointed to any communication that states this in any clear or explicit manner.

13.     Plaintiff disputes the contention at Docket 57 ¶ 25 in that Castellanos also stated that he stayed in Michigan after two months because, "all of the people, Jessica and the mates at the apartment, asked me to hold on, that something good

had to come. And when a coworker -- when a mate was -- an apartment mate was placed in an assignment, that that apartment mate would pull me to work in the project as well." (Docket 59-4 p. 16)

14.   Plaintiff disputes the contention at Docket 57 ¶ 12, because the paragraph is written in the past tense and the declaration supporting it (Docket 57-2 is written in the present tense. By shifting tenses in the statement of facts, Defendants attempt to establish that Rodriguez followed the process in all cases for all class members. At deposition, Rodriguez testified otherwise. Prior to working for SUSA she had never done any sort of recruitment work, nor worked in H.R. or technical fields. (Docket 60-1 p. 38).

15.   Rodriguez was asked directly if she told potential recruits whether it might take months to find them a project.  Rodriguez' response suggests that she avoids answering questions about how much time it will take to get placed:

> Q.     Do you tell people it might take months to find them a project?
> A.      It depends on the developer. I can't say --
> Q:      So you tell some of the developers that it might take them months to find a project?
> A.      I don't want to discourage them, but at the same time it depends on them. It's a question I get all the time to tell you the truth. How long am I going to stay there? It depends on you. It depends on your communication skills. It depends on your command of the technology. It depends on your performance, your personality, if you're introverted, all those things depend, and luck.
>                                       (Docket 60-1 pp. 30-31)

Furthermore, Rodriguez admitted that initially she did not know how long it would

take to place recruits into projects:

> Q.     You tell them that, it might be a month?
> A.     Yes. I'm very honest when I --
> Q.     From the very beginning you told them that?
> A.     Yes.
> Q.     How did you know it would take up to two months when you first started?
> A.     What do you mean after?
> Q.     I asked if you told people this from the very first person that you recruited. How would you know how long it would take to find a project if you had never done it before?
> A.     What you mean I've never done it before?
> Q.     You have one person. You said it was Peggy was your first client, right? So when Peggy asked -- do you remember if Peggy asked you how long it was going to take to put her in a project?
> A.     That was a long time ago. Maybe she did.
> Q.     So you don't know whether she asked you or not?
> A.     For sure she asked me, because they all ask. It's very important.
> Q.     Do you have any idea what your response to her was?
> A.     Maybe I said it depends on you. You can take -- when I said the two months is the experience I got from other developers. Of course I'm not going to say that to the first person, because he was my first person, right? So for what I was told to say, I was trained, you know, one week, two weeks, three weeks, one month. It depends on you more than us.
>
> (Docket 60-1 pp. 31-32)

Notably absent from Ms. Rodriguez' Declaration (Docket 57-2) is any assertion

that developers are told directly that although they will be obligated to be present

in the United States and at the offices of SUSA on a daily basis (Docket 60-1 p. 44

ll. 4-20) will not be paid the promised salary for a period of up to several weeks or

months.

I.   **Defendants acting wholly within the United State caused a domestic injury to class members' property namely their jobs, income and money.**

Defendants' argue, without merit, that class members suffered no "concrete domestic injury." The cases and situations cited veer far from the facts at hand in this case. In the present case, Defendants committed wire fraud, visa fraud and fraud in foreign Labor contracting. All of the actions taken by Defendants took place in the United States.

Jessica Rodriguez, sitting in an office in suburban Detroit testified that she placed ads seeking to recruit Mexican nationals to work for clients. (Docket 60-1 p.28) Then once she identified recruits who fit the specifications they sought she then explained to them the process and sent them materials via email for the recruits to use to obtain their TN visas. This process included a sending a sample resume for recruits to follow to add American work experience where it was lacking (Docket 57-7 "sometimes we need to add a project you worked here in the US(if you don't have one), because that attracts clients …" Rodriguez also sent the TN letter to be used to the recruits.  Except for the names, addresses, salaries and job descriptions the TN letters were identical (Docket 57-2) The letter were likely prepared by Rajat Mohan or an attorney for SUSA. (Docket 60-1 pp. 18-19) Upon completing the TN process, recruits were told to come to Michigan where they would then be placed. By definition class members could not suffer any

*foreign* losses once they were here nor could they have been victimized had they remained in Mexico. Transport to the U.S. was a necessary part of the enterprise to injure class members' business or property. Jobs are property for purposes of mail fraud. *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008). Furthermore, whether or not jobs are "property", the money paid for the job (that is, the salary) is "money." *United States v. Del Valle*, 674 F.3d 696, 704 (7th Cir. 2012).

Defendants' argument about class members not having suffered a domestic injury to their property falls apart completely. Defendants can only sustain their argument by ignoring factual allegations in Plaintiff's Complaint. Defendants assert:

> Plaintiffs allege injury from money spent "to arrange for travel to the United States" and from leaving "employment in [their] home country." (Dkt. #1, PgID 11-12, ¶ 65). They also claim the out-of-pocket cost of obtaining Visas. (Id., ¶ 32; Ex. 15, Ans. to Interrog. No. 5)

But Defendants wholly ignore the assertions in Paragraph 61 and 65 of Plaintiff's Complaint which states additionally, "they have not received the $52,000 of annualized income promised to them." At the time, the Complaint was drafted Plaintiff did not know that class members were in some cases offered different salaries. But the point still stands: the Complaint alleged domestic harms to class members' property and/or business (whether jobs or cash).

9

Defendants also claim erroneously, in a footnote that showing that "Proof of where Castellanos suffered his injury does not prove the location of injuries on a class-wide basis." (Docket 57 p.9 footnote) This too ignores the fact that Defendants conceded that class members were not paid on the date of their arrival in the United States and prepared a chart showing the dates, class members arrived in the United States and when they were first paid by SUSA. Plaintiff prepared two charts to support class certification.  The first shows the class members' names, dates of arrival, and dates of first paycheck. (Docket 21-1 pp.18-20) The second then counts the days they were no paid as promised. Docket 21-1 pp. 22-23). *Defendants* provided the names and information upon which the charts are based. While Defendants objected to the inclusion of various members for various reasons (Docket 24 pp. 8-9), they made no contention that the information they provided as to arrival and start/pay dates was inaccurate or incorrect.

To argue, as Defendants now do, that Castellanos has not proven the domestic site of harms to class members borders on the frivolous. The charts and Defendants' admissions as to the accuracy of the dates provided prove, without dispute, that class members suffered a domestic injury in their property and/or business -- whether it be the jobs they weren't really given (for varying amounts of time, if at all), or the money they would have earned had they been paid as the offer letters and TN letters said they would.

The cases Defendants cite are all inapposite. Defendants either misread or misapply the Supreme Court's holding in the case they assert is controlling over this issue. Although it's true that the Supreme Court stated "[a] private RICO plaintiff … must allege and prove a domestic injury to its business or property" this is hardly the end of the story or argument as it were. In *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016).

The Court explained:

> We therefore conclude that RICO applies to some foreign racketeering activity. A violation of § 1962 may be based on a pattern of racketeering that includes predicate offenses committed abroad, provided that each of those offenses violates a predicate statute that is itself extraterritorial. This fact is determinative as to § 1962(b) and § 1962(c), both of which prohibit the employment of a pattern of racketeering. Although they differ as to the end for which the pattern is employed—to acquire or maintain control of an enterprise under subsection (b), or to conduct an enterprise's affairs under subsection (c)—this difference is immaterial for extraterritoriality purposes.
>
> 136 S. Ct. at 2103.

Here, Plaintiff has brought claims under § 1962(b) and § 1962(c). As demonstrated above, class members have demonstrated a concrete, calculable, and wholly domestic harm they suffered, and could only have suffered, when they were brought over by SUSA using fraudulent TN visa letters stating that they intended to hire and pay class members on certain dates (Docket 59-2) with no intent of doing so. Despite requiring class members' presence in the United States and

despite requiring class members' presence (Docket 60-1 pp.44-45) Mohan testified

that he did not consider them to be SUSA employees unless they were coding:

> Q. You called Mr. Castellanos an employee; is that correct?
> A. Yes.
> Q. What made him Systems USA's employee?
> A. He becomes an employee of Systems USA once we -- so the definition of an employee from our perspective is that the person who comes in necessarily has to start doing work for us. Anybody that we hire has to start doing work for one of our projects.
> Q. So is he your employee before he starts doing work with the projects or after?
> A. Is he an employee before he starts working on the project or after?
> Q. Yes.
> A. The way we have identified it within the company is for -- we could have an employee, but if he's not doing any development -- essentially within
> our company the person has to -- its software development. The person has to develop code to be an employee of the company.
> Q. Does Jessica Rodriguez develop code?
> A. Her role is different. She's not on the software development side.
> Q. So for only for the software developers they have to be developing code to be employees?
> A. That's correct.

Mr. Mohan wants the best of both worlds here, he wants a stable of

programmers at his disposal to bid on and place into jobs, but he does not want to

pay them while he requires their presence in the United States and SUSA's offices,

answering phones and basically looking for their own jobs.  It's as if a law firm

told its associates, "we'll only pay you when you're actually doing legal research

and writing" – if the firm lacks work could it stop paying its associates yet still

require them to be present every day?  Of course not. This situation is no different.

Mohan clearly intended to deny pay to all class members until he placed them into projects and *sees nothing wrong with it.*

Defendants cite a number of cases in a further attempt to bolster its lack of "domestic injury" argument. And while the Supreme Court left the term undefined in *RJR Nabisco,* Defendants cannot expect to claim that being denied a promised salary while present and working in the United States is not a domestic harm. There is nothing about this transaction that occurs outside of the U.S. The only thing "foreign" are the class members who would not even be present to be harmed but for Defendants' scheme.

II.   **Class members had a contractual and statutory right to be paid the salary promised to them in the offer letters and TN letters sent which were not a mere "expectancy"**

Defendants next attempt to defend their actions by arguing that class members' injuries are not the type of "cognizable under RICO or were not caused by reason of the alleged RICO violation. (Docket 57 p.12) All Defendants' arguments in this vein are similarly unavailing.

i.   **The loss of promised income is not an intangible harm, it is a loss of property**

Defendants cite numerous readily distinguished cases to argue that class members' deprivation of income was a mere loss of an "expectancy." (Docket 57 p. 12)  Plaintiffs did not have a mere expectancy of employment they were offered employment by SUSA through the offer letters and TN letters. SUSA represented

to the Department of Motor Vehicles and the bank that Castellanos was a "full time employee". (Docket 59-1 pp. 14-15)  The TN visa program allows employers who offer applicants a job in the United States to sponsor them and obtain a visa to work for the employer in the U.S. The TN visa regulations require documentation which may be in the form of a letter from the prospective employer: " the documentation shall fully affirm: (A) The Appendix 1603.D.1 profession of the applicant; (B) A description of the professional activities, including a brief summary of daily job duties, if appropriate, in which the applicant will engage in for the United States employer/entity; (C) The anticipated length of stay; (D) The educational qualifications or appropriate credentials which demonstrate that the Canadian or Mexican citizen has professional level status; and (E) The arrangements for remuneration for services to be rendered 8 CFR § 214.6(d)(3)

Defendants cannot on the one hand argue that they "told" (whether orally or in writing or via Skype) class members that they would not be paid until and unless they were placed with a third party and then omit this material information from the offer letter and TN visa letter and expect these alleged representations to somehow bind class members to an agreement they did not make. Parole evidence can only be admitted where a contact is ambiguous neither the offer letter nor the TN letters are ambiguous.

Omitting this material information suggests strongly that the purpose of the omission was to cause visas to issue, where they would not have issued had the TN letters supplied by SUSA included this information. Both Rodriguez and Mohan claim not to know what would have happened had they submitted the letters and told the US Embassy that the offers of employment contained therein were contingent on class members being hired or approved by third parties. (Docket 60-1 pp. 22, 34, 36, 38;Docket 59-5 pp. 86, 88)

Contrary to assertions by Defendants (Docket 57 p. 13) the conduct engaged in *is* long-term and criminal. Since at least 2012 and continuing to the present, Defendants have made material misrepresentations to the U.S. Embassy in Mexico to secure TN visas for class members, and others. The damages claimed are lost promised wages and redily distinguishable from those sought in the cases cited by Defendants.

### ii.     Not paying an employee a promised salary is not the mere loss of an "expectancy" it is a loss of property.

In *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215(2d Cir. 2008), the Court considered a case where smokers brought a RICO case where they alleged a "loss of value" because they were induced to buy light cigarettes and lost value of 77.7% because the cigarettes were not more healthful as purported to be. In the present case the loss of income is not speculative and readily determined in each case.

In *Heinold v. Perlstein*, 651 F. Supp.1410 (E.D. Pa. 1987), it's not clear whether the Plaintiff in the case pled an enterprise, which was used to conduct a pattern of racketeering or even what any single predicate act might be. The buyer of a diamond ring sued under RICO to recover profits lost because he believed the ring to be more valuable than what was represented to him. These facts come nowhere near the facts here where class members were promised jobs and signed contracts entitling them to the salaries when they fulfilled the three contingencies – signing the offer letter, being approved for a TN visa and proof of employment eligibility. (Docket 59-1 p.16)

This is an enforceable and valid contract and is property – the loss of which triggers standing to sue under RICO. Jobs are property and the money paid for the job (that is, the salary) is "money." *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008); *United States v. Del Valle*, 674 F.3d 696, 704 (7th Cir. 2012). Contrary to Defendants' hopeful assertions at Docket 57 p. 14 this was not a "mere expectancy."

Defendants seem to misapprehend Plaintiff's claim when they argue that the expectation interest would not have existed but for the alleged RICO violation. There was a valid contract and not a mere expectation. The contract was not the RICO violation – wire fraud, visa fraud and fraud in foreign labor contracting were the predicate acts which triggered RICO liability. In *Strates Shows, Inc.*

*v.Amusements of Am., Inc.,* 379 F. Supp. 2d 817, 827 (E.D.N.C. 2005) cited by

Defendants at Docket 57 p.14, a contractor sued because he alleged that he was

denied a contract he bid upon due to an alleged RICO scheme. In *Strates* there was

no existing contract, unlike in the present case (Docket 59-1 p. 16) just a bid to get

one.

### iii.     RICO does not require victims to have relied upon a fraudulent statement for liability to attach.

Defendants, at Docket 57 p.16, attempt to argue that detrimental reliance is

necessary to establish liability under RICO, however the Supreme Court has made

clear that this is not necessary. In *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S.

639, 649-650 (2008) the Supreme Court explained:

> "Reliance is not a general limitation on civil recovery in tort; it „is a
> specialized condition that happens to have grown up with common law
> fraud." *Anza*, 547 U.S., at 477, 126 S.Ct. 1991 (THOMAS, J., concurring in
> part and dissenting in part) (quoting Systems Management, 303 F.3d, at
> 104). That "specialized condition," whether characterized as an element of
> the claim or as a prerequisite to establishing proximate causation, simply has
> no place in a remedial scheme keyed to the commission of mail fraud, a
> statutory offense that is distinct from common-law fraud and that *does not
> require proof of reliance.*

Defendants also seem to argue at Docket 57 pp. 16-17 that class members'

injuries were not proximately caused by Defendants' acts because their alleged

knowledge of the scheme not to pay them broke "the chain of causation between

the alleged RICO violation (the allegedly misleading offer letter) and Castellanos'

alleged injuries..." This ignores the fact that Plaintiff has also pled visa fraud and fraud in labor contracting as acts committed by Defendants.

RICO provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation" of the Act's criminal prohibitions. §1964(c). Here, whatever was said to class members, in the offer letters or not, is immaterial, in part, because detrimental reliance need not be shown to bring a RICO claim. But what was said to class members is irrelevant also because Plaintiff has alleged visa fraud, and fraud in foreign labor contracting as predicate acts which were violated by Defendants. In those cases, the fraud is not perpetrated against an individual, but against the state.

This fraud against the state is relevant to the proximate cause argument made by Defendants at Docket 57 p. 17, in that no plaintiff will be able to say that he was directly injured by a fraud upon the state, much less that he "relied" on the fraud – how could he?

### iv.    Class members' harm were caused by Defendants' conduct

Defendants' citation to *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71(2d Cir, 2015) to support their proximate cause argument fails in that S*anofi-Aventis* is another mail fraud case. The misrepresentations under Plaintiff's theory are not the cause of their injury, the cause is the manipulation of the TN visa system (visa fraud and fraud in foreign

labor contracting) which allowed Defendants to bring class members from Mexico and not pay them even as Defendants required them to be present on a daily basis at SUSA offices. The misrepresentations can have no effect if Defendants cannot acquire TN visas and bring class members to the U.S. As to whether the visa fraud and fraud in foreign labor contracting are the proximate cause of class members' injuries, the chain of causation is quite direct class members could not have suffered a loss of property had they not been present to be victimized by Defendants.

Furthermore, all of Defendants arguments regarding reliance and lack of liability require the Court to find that Defendants informed all class members that they would not be paid for weeks or months while a job was found for them with a third party. Castellanos has vigorously disputed this and as argued above such reliance is not necessary for class members to prove their Section 1962(c) claims.

### III.   Plaintiff has adequately pled the SUSA was an enterprise which Defendants conducted through a pattern of racketeering activity.

Defendants at Docket 57 p.18, fail to read *Cedric Kushner Promotions, Ltd. v.King*, 533 U.S. 158 (2001), all the way through to find that it stands for precisely the opposite of the proposition they promote. The Supreme Court explained:

> While accepting the "distinctness" principle, we nonetheless disagree with the appellate court's application of that principle to the present circumstances—circumstances in which a corporate employee, "acting within the scope of his authority," 219 F. 3d, at 117, allegedly conducts the corporation's affairs in a RICO-forbidden way. The

> *corporate owner/employee, a natural person, is distinct from the corporation itself*, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more "separateness" than that. Cf. *McCullough v. Suter*, 757 F. 2d 142, 144 (CA7 1985) (finding either formal or practical separateness sufficient to be distinct under § 1962(c)).
>
> 533 US at 163 (emphasis supplied)

The Court went on:

> Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any "person" unlawfully to conduct an "enterprise," particularly when the statute explicitly defines "person" to include "any individual . . . capable of holding a legal or beneficial interest in property," and defines "enterprise" to include a "corporation." 18 U. S. C. §§ 1961(3), (4). And, linguistically speaking, the employee and the corporation are different "persons," even where the employee is the corporation's sole owner. After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs. See *United States v. Bestfoods*, 524 U. S. 51, 61-62 (1998); *Burnet v. Clark,* 287 U. S. 410, 415 (1932); 1 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 7, 14 (rev. ed. 1999). *Id.*

Defendants argue at Docket 57 p.25, that "Plaintiffs cannot evade the person-enterprise distinction by relying on the bare allegation that the enterprise consisted of SUSA, Systems USA, Inc. and Systems Consulting LLC. Here, as in *Kushner*, the only entity needed to establish a RICO enterprise is SUSA. In addition to serving as a tech labor contractor, the TN letter stated that "Systems USA is a leading distributor of IT and Consumer products with headquarters in Michigan, USA and offices in Singapore and India." (Docket 59-1 p. 2) Therefore,

apart from the actions of Mohan and Rodriguez it is a corporation with presumably legal and legitimate ends.

By undertaking the TN visa fraud recruiting scheme, Mohan and Rodriguez began to operate the enterprise through a pattern of racketeering activity – many more than ten TN visa letters were provided by Defendants (Docket 59-2) to class members to fraudulently bring them to the U.S. by omitting any mention of the peculiar compensation agreement they had in mind.

As in *Kushner*, here too Mohan is an owner and member of the LLC, but is legally distinct from SUSA. Rodriguez, as an employee and not an owner also is a different and distinct person from the enterprise which is SUSA. "A corporate employee who conducts the corporation's affairs through an unlawful RICO "pattern . . . of activity," § 1962(c), uses that corporation as a "vehicle" whether he is, or is not, its sole owner." *Kushner,* 533 US at 164-5. The Court explained further:

> an enterprise is "`operated,' " within § 1962(c)'s meaning, "not just by upper management but also by lower rung participants in the enterprise *who are under the direction of upper management* " (emphasis added)). It would immunize from RICO liability many of those at whom this Court has said RICO directly aims—e. g., high-ranking individuals in an illegitimate criminal enterprise, who, seeking to further the purposes of that enterprise, act within the scope of their authority. *Id*.

The Court concluded, "we hold simply that the need for two distinct entities is satisfied; hence, the RICO provision before us applies when a corporate employee

unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority." In the present case where Mohan is an owner/member of the LLC, SUSA is a distinct entity and so is Rodriguez, the need for at least two distinct entities is satisfied as well.[1]

## IV.    The intra-corporate conspiracy doctrine cannot be used to defeat RICO claims in light of the case law finding employees, owners and corporations to be distinct legal entities.

Defendants cites cases, mostly from the 1980s and 1990s to assert that the intra-corporate conspiracy doctrine bars Plaintiff's claims under Section 1962(d). Given the foregoing discussion of *Kushner*, it seems unlikely that the Court would agree with these older precedents.  However, Rodriguez' deposition testimony suggests that there are in fact two corporations participating in the scheme. Although not alleged in the Complaint (because it was unknown at the time), the fact that Rodriguez continues to be paid by SUSA (Docket 60-1 pp. 17-18), while conducting largely the same scheme for Precedency Solutions, makes Precedency a potential Defendant as well. Precedency is a distinct entity from SUSA and although Rodriguez performs services for it she cannot be said to be its employee

[1] Although not alleged in the Complaint (because it was unknown at the time), the fact that Rodriguez continues to be paid by SUSA (Docket 60-1 pp. 17-18) while conducting largely the same scheme for Precedency Solutions, makes Precedency a potential Defendant as well either through an alter-ego theory, veil piercing theory (because by paying Rodriguez out of SUSA funds for performing Work for Precedency is a comingling of assets) or under RICO section 1962(a).

as she is paid by SUSA. Precedency may also be subject to a claim under Section 1962(a) as it receives the benefit of Rodriguez' work which is paid by funds acquired through a RICO scheme. That Defendants have continued to withhold material information as to the nature of the offered "employment" from the United States Embassy in the TN letters sent to sponsor recruits by Mohan and Rodriguez through Precedency Solutions, speaks volumes about the impunity with which they expect to be treated. (Docket 59-1 pp. 22, 36)

**V.  Defendants argument with respect to the fraud claim fails as it requires the Court to decide disputed facts to resolve.**

Defendants argue in Section IV of their brief (Docket 57 pp. 21-24) that Castellanos did not reasonably rely on the offer letters and other correspondence. This entire section relies on facts that are disputed by Plaintiff as set out in the Statement of Disputed Facts at pages 2-7 above. Any cursory reading of the communications between Rodriguez reveals an astounding lack of candor and attempts to dissemble when asked specific questions. (Docket 57-5, 57-6, 57-13) As to the argument that the offer letter referred to another employment agreement that was "attached", no such attachment was included nor has it ever been presented. One interpretation of the "attached" language was that the offer letter itself was an attachment to an email.  Because Defendants arguments to rule in their favor on Plaintiff's fraud claims require the Court to read the facts in the light most favorable to Defendants and to make inferences in their favor, the Court

should deny Defendants the benefit afforded to non-moving parties and deny Defendants' motion.

## CONCLUSION

Plaintiff, has shown that he and all class members were injured in their property, namely the jobs they contracted to fill in the United States and for which they were denied compensation even as Defendants required class members to be present on a daily basis in their offices. Defendants run SUSA (and Precedency too) as a corrupt enterprise by engaging in a pattern of wire fraud, visa fraud and labor contracting fraud and these acts were both the cause in fact and proximate cause of class members' losses. Plaintiff also has made out the elements of a RICO conspiracy. As to the claims for fraud, Plaintiff recognizes that there are disputes of material facts which preclude Summary Judgment.

For all the foregoing reasons, Plaintiff respectfully requests that this Court deny Defendants' Motion for Partial Summary Judgment in its entirety.

By:    /s Jorge Sánchez<br>Attorney for Plaintiffs

Lopez & Sanchez
77 W. Washington St.
Suite 1313
Chicago, IL  60602
(312) 420-6784

## CERTIFICATE OF SERVICE

I, Jorge Sanchez, an attorney, certify that on July 15, 2017 I electronically filed the foregoing PLAINTIFF'S BRIEF IN RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT with the Clerk of the Court of the United States Court for the Eastern District of Michigan Division, using the CM/ECF System, which will send an electronic notification to the following counsel of record:

Michael C. Simoni
Miller Canfield
840 West Long Lake Road, Suite 150
Troy, Michigan 48098 (USA)
T +1.313.496.7583
simoni@millercanfield.com

and

Nicole Marshall
Marshall Law, PLLC
Attorneys for Defendants
189 W. Clarkson Rd. Ste.
Lake Orion, MI 48362
P (248) 429-9529
nicole@marshalllawmi.com
s/ Jorge Sánchez